UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHENIQUA ROWE and | ) | |
| TAHESHA STREETER, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 23-cv-2082 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| PAPA JOHN'S INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**MEMORANDUM OPINION & ORDER**</u>

This case is another drop in the tidal wave of cases under the Illinois Biometric Information Privacy Act that has crashed down and flooded courthouses across the state. Sheniqua Rowe and Tahesha Streeter worked at Ozark Pizza Company, a franchisee of Papa John's. They used a fingerprint scanner to perform a number of tasks, including clocking in and out of work and inputting delivery information.

Rowe and Streeter contend that they scanned their fingerprints thousands of times. And they believe that Papa John's used, kept, and disseminated their biometric data without their consent. So, they sued. Papa John's, in turn, moved to dismiss.

For the reasons explained below, the motion to dismiss is granted in part and denied in part.

**Background**

At the motion to dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast

the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

This case is about two former Papa John's employees who scanned their fingerprints as part of their duties while working at the company's restaurants. *See* Am. Cplt., at ¶¶ 10–12, 20 (Dckt. No. 16).

Defendant Papa John's International, Inc. is one of the largest pizza chains in the United States. It has over 5,500 pizza shops, located domestically and abroad. *Id.* at ¶ 5. More than 5,000 of Papa John's restaurants are franchised, and the rest are owned by the company. *Id.*

Plaintiffs Sheniqua Rowe and Tahesha Streeter worked at Papa John's restaurants in Illinois. *Id.* at ¶¶ 11–13. The restaurants were owned and operated by nonparty Ozark Pizza Company, a franchisee with dozens of restaurants in Illinois and other states. *Id.* at ¶ 10.

Rowe worked for Ozark from 2014 through 2017, and Streeter worked for Ozark from 2015 through 2020. *Id.* at ¶ 15.

Both Rowe and Streeter worked as Ozark's "shift leaders," meaning that they regularly worked at multiple Papa John's franchises run by Ozark. *Id.* at ¶ 13. Streeter also served as an Ozark general manager. *Id.* at ¶ 14.

Papa John's has developed a proprietary point of sale system, called FOCUS, which is used across its company-owned stores and its franchised locations. *Id.* at ¶¶ 16–17. Ozark uses the FOCUS system under its franchise agreement with Papa John's. *Id.* at ¶ 16.

The FOCUS system has a built-in fingerprint scanner. *Id.* at ¶ 18. Papa John's requires franchisees like Ozark to use the fingerprint scanner "whenever possible" for employees to perform certain tasks. *Id.* at ¶ 19. Ozark required workers to use FOCUS to clock in and out, and to unlock the system for transactions. *Id.* at ¶¶ 23–24.

2

Rowe and Streeter used the scanner for at least three purposes, including clocking in and out of work, inputting delivery routing, and authenticating themselves for FOCUS access. *Id.* at ¶ 20. In their roles as shift leaders – and in Streeter's position as general manager – Rowe and Streeter used FOCUS to scan other employees in and out, and to perform other tasks associated with their positions. *Id.* at ¶ 25.

Rowe's fingerprints were scanned no fewer than 10,000 times while she worked for Ozark. *Id.* at ¶ 41. And Streeter's fingerprints were scanned no fewer than 15,000 times. *Id.* at ¶ 42.

Papa John's could remotely download and collect data from FOCUS, plus monitor fingerprint-scanner use. *Id.* at ¶ 22. The company used FOCUS to remotely access Ozark's point of sale system. *Id.* at ¶ 29. Daily, Papa John's would collect information from Ozark's point of sale system. *Id.* at ¶ 30. The system used by Ozark "captured Plaintiffs' biometrics and transmitted that information to Defendant." *Id.*

Papa John's prepares and circulates reports that identify the franchisees and workers who do not use FOCUS's fingerprint scanner and instead use passwords for authentication. *Id.* at ¶ 32.

Papa John's used FOCUS to collect and maintain something called "reference templates" from workers' fingerprints. *Id.* at ¶ 27. By the sound of things, a reference template is an image of the fingerprints, akin to a model. The company uses that image as the point of comparison each time an employee puts his or her fingers on the scanner.

When an Ozark employee scanned her fingerprint, FOCUS compared the fingerprint to the reference fingerprint template of the employee. *Id.* at ¶ 21. Through its remote access, Papa

John's could monitor fingerprint-scanner usage, including Plaintiffs' access and usage. *Id.* at ¶ 31.

Papa John's and Ozark never asked Rowe and Streeter for consent before collecting fingerprint templates and data through FOCUS. *Id.* at ¶ 36. Papa John's and Ozark did not inform Plaintiffs about "how each would use the fingerprint data, how long each would store the data, or provide a publicly available retention policy regarding retention and storage of biometric data." *Id.* at ¶ 37. Papa John's never gave Rowe and Streeter a written heads-up about their biometrics being stored, collected, and used, either. *Id.* at ¶ 39. And Plaintiffs never consented to Papa John's disclosing their fingerprint data collected through FOCUS. *Id.* at ¶ 40.

Papa John's did not destroy Plaintiffs' "biometric identifiers of information," even though BIPA required it to do so no later than three years after their employment ended. *Id.* at ¶ 38. The pizza chain had no post-employment retention and destruction policy on the books during Plaintiffs' employment. *Id.*

Biometric data can be a target for hackers and identity thieves. *Id.* at ¶ 45. Because fingerprints are unique and permanent, privacy concerns for fingerprint data can exceed concerns about other identifiers (such as key cards). *Id.* at ¶ 43.

If a key card is stolen, the card can be deactivated, and a new one can be made. If a password is stolen, it can be changed. Even a Social Security Number can be replaced. But once a fingerprint is stolen, there's not much an employee can do. *Id.* After all, a fingerprint is permanent, and each of us gets only one set.

Rowe sued Papa John's on April 3, 2023. *See* Cplt. (Dckt. No. 1). She filed a first amended complaint (the operative complaint) on June 13, 2023, adding Streeter as a plaintiff. *See* Am. Cplt. (Dckt. No. 16).

The amended complaint has six counts, all under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14 *et seq. Id.* at ¶ 1. Counts I, III, and V are brought by Rowe, while Counts II, IV, and VI are brought by Streeter. *Id.* at 13–25.

Basically, each plaintiff brings three claims. Each claim is based on a different provision of BIPA. Counts I and II involve section 15(a), Counts III and IV involve section 15(b), and Counts V and VI involve section 15(d).

Counts I and II allege a failure to institute, maintain, and adhere to a publicly available retention schedule in violation of section 15(a) of BIPA. *Id.* at ¶¶ 71–94. Counts III and IV allege a failure to obtain informed written consent and release before obtaining biometric identifiers or information in violation of section 15(b) of BIPA. *Id.* at ¶¶ 95–126. Finally, Counts V and VI allege that Papa John's disclosed Plaintiffs' biometric identifiers and information without obtaining consent, in violation of section 15(d) of BIPA. *Id.* at ¶¶ 127–48.

Plaintiffs seek statutory damages of $5,000 for each willful or reckless violation of BIPA, or in the alternative, statutory damages of $1,000 for each negligent violation. *Id.* Plaintiffs also seek attorneys' fees and costs. *Id.*

This case is not the only case in this courthouse alleging violations of BIPA by Papa John's. And it is not the first case, either.

On December 3, 2020, a different plaintiff filed a separate lawsuit against Papa John's under BIPA. *See Kyles v. Hoosier Papa LLC*, 20-cv-7146 (N.D. Ill.). The plaintiff in *Kyles* filed that case roughly three years before the case at hand.

The *Kyles* case is a putative class action. The complaint includes a proposed "Papa John's International Class" covering "[a]ll individuals who used a fingerprint scanner connected

to a FOCUS system in the State of Illinois within the preceding five years." *See* Cplt., at ¶ 24, in *Kyles v. Hoosier Papa LLC*, 20-cv-7146 (N.D. Ill.).

In the case at hand (filed by Rowe and Streeter), Papa John's moved to dismiss the first amended complaint. *See* Def.'s Mtn. to Dismiss (Dckt. No. 22). In the alternative, Papa John's requested consolidation with the first-filed *Kyles* case. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 11–15 (Dckt. No. 23).

The district court in the *Kyles* case denied the motion for reassignment and consolidation, so the cases are proceeding on separate but parallel paths. But the *Kyles* case does have another potentially important impact on the case at hand.

Rowe and Streeter appear to fall within the proposed class definition in the *Kyles* case. Again, Rowe worked for Ozark from 2014 to 2017, and Streeter worked for Ozark from 2015 to 2020. The proposed class definition in *Kyles* runs from December 2015 to December 2020. So some, but not all, of their claims fall within the proposed class period in *Kyles*.

The class definition in *Kyles* covers employees who used the fingerprint scanner connected to the FOCUS system. That is the same system at issue in the case at hand.

*Kyles* and *Rowe* are on similar tracks, running parallel. The question at hand is whether the complaint in *Rowe* states a claim. As it turns out, the answer to that question requires this Court to take another look at *Kyles*.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from

those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When sitting in diversity, the Court "must exercise care and caution" in applying state law. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). The Court's task is to determine how the state's highest court would rule, with the decisions of the state's intermediate appellate courts providing controlling guidance "unless there is a convincing reason to predict the state's highest court would disagree." *Id.* (quotation marks omitted).

**Analysis**

## I. Article III Standing

Papa John's does not call into question whether Plaintiffs have Article III standing to sue. But Papa John's argues that Plaintiffs alleged a "mere statutory aggrievement," which got this Court's standing spider-sense tingling. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 28).

A federal court is duty-bound to solidify its jurisdictional footing, even if the parties do not raise it. *See Dexia Crédit Loc. v. Rogan*, 602 F.3d 879, 883 (7th Cir. 2010). A key component of jurisdiction is Article III standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

Article III standing has three familiar elements. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

An injury must be "concrete, particularized, and actual or imminent." *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021) (citation omitted). An injury is concrete if it is "real, and not abstract." *See Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (7th Cir. 2023) (citation omitted).

The Seventh Circuit has issued several opinions on Article III standing in the BIPA context. More specifically, the Court of Appeals has addressed whether plaintiffs have standing to sue under each of the three BIPA sections at issue here – *i.e.*, section 15(a), section 15(b), and section 15(d).

The Court will march through each statutory provision, and address the issue of standing. The punchline is that Rowe and Streeter have standing to pursue claims under all three sections.

### A.     Standing Under Section 15(a)

Section 15(a) of BIPA governs the retention of biometric data. *See* 740 ILCS 14/15(a). Under section 15(a), "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information." *Id.* In addition, a company that has biometric data "must comply with its established retention schedule and destruction guidelines." *Id.*

A few years ago, the Seventh Circuit concluded that a plaintiff did not have Article III standing to sue under section 15(a). *See Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020). The claim in *Bryant* had to do with the lack of public notice about the retention

schedule.  The Court of Appeals ruled that the lack of public notice, without more, was not enough to give rise to an injury to the employee.

The plaintiff in *Bryant* did not contend that the employer failed to *comply* with a retention schedule.  She simply claimed that it failed to make a retention schedule publicly available.  *Id.* The employee "alleged only a claim under the provision of [section 15(a)] requiring development of a 'written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information . . . .'" *Id.* (citation omitted).

The lack of public notice did not give rise to standing, because any harm flowed to the public at large, not to the individual employee.  "[T]he duty to disclose under section 15(a) is owed to the public generally, not to particular persons whose biometric information the entity collects."  *Id.*

Still, the Seventh Circuit called attention to the narrowness of its holding.  The Court of Appeals reserved for another day whether a plaintiff has standing to sue under the provision "requiring compliance with the established retention schedule and destruction guidelines."  *Id.*

The Seventh Circuit later answered that question.  *See Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154–55 (7th Cir. 2020).  The Court of Appeals concluded that plaintiffs have standing to sue over an alleged failure to comply with the retention schedule and destruction guidelines.  *Id.*  "An unlawful retention of biometric data inflicts a privacy injury in the same sense that an unlawful collection does. . . . [U]nlawful *retention* of a person's biometric data is as concrete and particularized an injury as an unlawful *collection* of a person's biometric data."  *Id.* (emphasis in original).

9

Rowe and Streeter check both boxes. They allege that Papa John's failed to publicize retention guidelines *and* that the company retained their biometric data in violation of section 15(a). *See* Am. Cplt., at ¶¶ 77–79, 89–91 (Dckt. No. 16). The unlawful retention of their biometric data is an injury under Article III. So, they have standing under section 15(a).

### B. Standing Under Section 15(b)

Section 15(b) of BIPA creates an informed consent requirement. *See* 740 ILCS 14/15(b). Basically, before collecting biometric data, a company must (1) inform the subject about the collection in writing; (2) inform the subject about why the data is being collected and the "length of term" for its collection, storage and use; and (3) receive written permission for the collection. *Id.*

In *Bryant*, the Seventh Circuit held that a plaintiff has Article III standing under section 15(b) when she alleges that a company collected her data without informed consent. *See Bryant*, 958 F.3d at 626. The Seventh Circuit opined that "[defendant] Compass withheld substantive information to which Bryant was entitled and thereby deprived her of the ability to give the *informed* consent section 15(b) mandates." *Id.* (emphasis in original). The Seventh Circuit concluded that the lack of informed choice caused a concrete and particularized injury. *Id.*

Like the plaintiff in *Bryant*, Rowe and Streeter contend that Papa John's failed to obtain written consent, or a written release, before collecting their data. *See* Am. Cplt., at ¶¶ 103–06, 120–22 (Dckt. No. 16). Therefore, they have standing to sue under section 15(b).

### C. Standing Under Section 15(d)

The last provision is section 15(d) of BIPA. Section 15(d) prohibits companies that collect biometric data from disclosing, redisclosing, or disseminating such information without consent (with a few limited exceptions). *See* 740 ILCS 14/15(d).

In *Cothron v. White Castle System, Inc.*, the Seventh Circuit concluded that "a violation of section 15(d) inflicts a concrete and particularized Article III injury." *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1161 (7th Cir. 2021). The Seventh Circuit compared a violation under section 15(d) to a violation under section 15(b), reasoning that an injury under either statutory provision "deprives a person of the opportunity to consider who may possess his biometric data and under what circumstances, given the attendant risks." *Id.* (internal quotation marks omitted).

The complaint alleges that Papa John's disseminated Plaintiffs' information by transferring it from the scanners at the Ozark restaurants. Rowe and Streeter thus have Article III standing to bring their claims under section 15(d).

\* \* \*

With standing on sure footing, the Court will turn to the merits.

Papa John's moves to dismiss on five grounds. The first argument is about the statute of limitations and equitable tolling. The second argument is about *laches*, an affirmative defense. The third argument is whether Plaintiffs were aggrieved within the meaning of BIPA. The fourth argument is a constitutional argument about excessive damages. The fifth argument is about duplication with *Kyles*.

The Court will address each argument in that order.

## II. The Statute of Limitations and Equitable Tolling

The first issue is whether Plaintiffs brought their claims too late. More precisely, the question is whether Plaintiffs can get the benefit of equitable tolling based on the filing of another class action lawsuit.

At first glance, after looking at only the complaint at hand, it looks like a significant portion of the claims are time barred. The statute of limitations for BIPA claims is five years.

*See Tims v. Black Horse Carriers, Inc.*, 216 N.E.3d 845, 854 (Ill. 2023). For each Plaintiff, a large part of the employment period falls on the other side of the five-year line.

Rowe filed the complaint on April 3, 2023, and Streeter hopped on board in the amended complaint on June 13, 2023. *See* Cplt. (Dckt. No. 1); *see also* Am. Cplt. (Dckt. No. 16). The five-year mark for Rowe begins on April 3, 2018, and the five-year mark for Streeter beings on June 13, 2018.

Each plaintiff brings claims outside that five-year window. Rowe alleges that she worked for Ozark from 2014 to 2017. *See* Am. Cplt., at ¶ 15 (Dckt. No. 16). Her employment falls on the wrong side of the line. Her employment ended in 2017, but the dividing line is 2018. She left her job more than five years before the filing of this suit in 2023.

Streeter alleges that she worked for Ozark from 2015 to 2020. *Id.* Some, but not all, of Streeter's employment falls on the other side of the five-year line. By the look of things, anything before June 13, 2018 seems time barred.

Rowe and Streeter acknowledge that, based on the complaint alone, it looks like they missed the boat. *See* Am. Cplt., at 3 n.2 (Dckt. No. 16). Rowe ended her employment more than five years before filing suit, and Streeter started working more than five years before filing suit, too. It looks like all of Rowe's claims are barred, and some of Streeter's claims are barred.

But Plaintiffs believe that the *Kyles* case provides a saving grace. In their view, they benefit from equitable tolling because they were putative class members in that case. As they see it, the filing of that class action stopped the clock.

Papa John's argues that the *Kyles* case cannot give rise to equitable tolling. As Papa John's sees it, equitable tolling does not apply because Plaintiffs filed suit while the issue of

class certification in *Kyles* was pending. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 4–5 (Dckt. No. 23).

A timely filed class action tolls the statute of limitations for all putative class members. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 544 (1974). Under *American Pipe*, the filing of a class action stops the clock for all members of the would-be class. *See China Agritech, Inc. v. Resh*, 584 U.S. 732, 736 (2018).

The clock restarts when "certification is denied," or when the case is "dismissed – with or without prejudice – before the class is certified." *Collins v. Vill. of Palatine*, 875 F.3d 839, 841, 843 (7th Cir. 2017). That is, the tolling continues until the case is "stripped of its character as a class action." *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 393 (1977); *see also Collins*, 875 F.3d at 840–41 ("This 'stripping' occurs immediately when a district judge denies class certification, dismisses the case for lack of subject-matter jurisdiction without deciding the class-certification question, or otherwise dismisses the case without prejudice.").

The Supreme Court has yet to address whether a plaintiff enjoys the benefits of equitable tolling under *American Pipe* when she files a separate, individual action *before* a court decides class certification in the first-filed suit. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, *30 (N.D. Ill. 2015) (Dow, J.). In the meantime, a circuit split has developed.

At first, courts concluded that equitable tolling did not apply. Four decades ago, the First Circuit held that a plaintiff was not entitled to equitable tolling while a ruling on class certification remained pending. The First Circuit opined that "the policies behind Rule 23 and *American Pipe* would not be served, and in fact would be disserved, by guaranteeing a separate

suit at the same time that a class action is ongoing." *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983).

Two decades later, the Sixth Circuit agreed. "The purposes of *American Pipe* tolling are not furthered when plaintiffs file independent actions before decision on the issue of class certification, but are when plaintiffs delay until the certification issue has been decided." *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005).

Since then, four appellate courts have come out the other way. The rationale largely turns on the lack of surprise. "[S]tatutory limitation periods are 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *See Am. Pipe & Constr. Co.*, 414 U.S. at 554.

A defendant is not blindsided if a member of a proposed class files his or her own lawsuit. After all, a defendant already knows about the potential for liability to everyone in the would-be class. *See In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007) ("It would not undermine the purposes of statutes of limitations to give the benefit of tolling to all those who are asserted to be members of the class for as long as the class action purports to assert their claims. As the Supreme Court has repeatedly emphasized, the initiation of a class action puts the defendants on notice of the claims against them."); *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008) (adopting the reasoning of the Second Circuit and opining that because "the filing of a timely class action provides defendants with notice of the claim . . . a follow-on individual suit cannot surprise defendants"); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1235 (10th Cir. 2008) ("The rule of the Second and Ninth Circuits, articulated in *In re WorldCom* and *In re Hanford,* comports with the language and the legal and pragmatic bases for

*American Pipe* and its progeny."); *Aly v. Valeant Pharms. Int'l Inc.*, 1 F.4th 168, 178 (3d Cir. 2021) (agreeing with the Second, Ninth, and Tenth Circuits). A defendant already knows about the claim by the entire pack, so it is not a revelation if a member of the pack breaks off and files his or her own suit.

      The Seventh Circuit has not yet weighed in. Meanwhile, district courts in this Circuit have reached different conclusions. At first, district courts disfavored tolling, but the pendulum has swung in the other direction in recent years. *Compare In re Dairy Farmers*, 2015 WL 3988488, at *30 ("find[ing] the more-recent opinions" by the Second and Ninth Circuits "to be more persuasive" than the opinions of the First and Sixth Circuits), *and Hernandez v. City of Chicago*, 2011 WL 149455, at *1 (N.D. Ill. 2011) (concluding that "the commencement of the . . . class action suspended the applicable statute of limitations as to the plaintiff, who elected to proceed on an independent basis"), *and Mason v. Long Beach Mortg. Co.*, 2008 WL 4951228, at *2 (N.D. Ill. 2008) ("While the Seventh Circuit has not decided this issue, this Court agrees with the Second, Tenth, and now Ninth Circuits by including as tolled the limitations period for the claims of putative class members who opt out of the class before a ruling on class certification."), *with Kozlowski v. Sheahan*, 2005 WL 3436394, at *3 (N.D. Ill. 2005) (concluding that tolling did not apply after adopting the rule from *Wyser-Pratte* and *Glater*), *and In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 WL 474146, at *8 (N.D. Ill. 1998) (finding that tolling should not apply because "Individual Plaintiffs made a conscious decision early on to pursue their claims on an entirely separate, though essentially parallel, track from that of the Class case").

The trend has swung in favor of tolling. District courts originally sided with the First and Sixth Circuits. But once a circuit split came into existence, district courts have sided with the Second, Third, Ninth, and Tenth Circuits.

The Seventh Circuit did not answer the exact question at hand in *Collins*. But the Court of Appeals used language that suggests which way the wind is blowing. The Seventh Circuit emphasized the importance of having "a simple and uniform rule" on tolling. *See Collins*, 875 F.3d at 841. "Tolling stops immediately when a class-action suit is dismissed . . . before the class is certified." *Id.*; *see also Culver v. City of Milwaukee*, 277 F.3d 908, 914 (7th Cir. 2002).

*Collins* noted the balance struck by *American Pipe* and its progeny between "judicial efficiency and the policies underlying statutes of limitations." *See Collins*, 875 F.3d at 845. That is, individual class members enjoy tolling while class certification is looming for judicial efficiency reasons. *Id.* But once a class action falls away (from the denial of class certification, or dismissal), the general policy behind a limitations period kicks back in. *Id.*

"[W]ithout tolling, individual class members would have to file suit in order to protect their claims from becoming time-barred. But continuing to toll the limitations period beyond the dismissal of a noncertified class claim would encroach more severely on the interests underlying statutes of limitations, the purpose of which is 'to protect defendants against stale or unduly delayed claims.'" *Id.* (citation omitted).

At the end of the day, the answer to the question of tolling turns on state law, not federal law. Plaintiffs bring claims under state law. State law governs the limitation period, including the issue of tolling. *See Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 265 (7th Cir. 1998) ("When state law supplies the period of limitations, it also supplies the tolling rules.").

Illinois follows *American Pipe*. "[U]pon the filing of a class action, the statute of limitations is normally tolled for all putative plaintiffs." *Hess v. I.R.E. Real Est. Income Fund, Ltd.*, 629 N.E.2d 520, 531 (Ill. App. Ct. 1993). "[I]n Illinois, a tolled limitations clock starts ticking again only when a court denies class certification, or when certain procedural events happen (for example, the limitations period starts running again for a class member who opts out of a certified class)." *McFields v. Sheriff of Cook Cnty.*, 2018 WL 1784138, at *2 (N.D. Ill. 2018).

There is a wrinkle when one case is filed in state court, and another case is filed in federal court. Illinois does not apply *American Pipe* tolling for plaintiffs in state court when there is a case in federal court with a putative class.

That is, Illinois does not recognize "cross-jurisdictional tolling." *See Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1104 (Ill. 1998). The Illinois Supreme Court explained that "because state courts have no control over the work of the federal judiciary, we believe it would be unwise to adopt a policy basing the length of Illinois limitation periods on the federal courts' disposition of suits seeking class certification." *Id.*

The Illinois Supreme Court expressed concern about adopting a tolling rule that was more favorable than the tolling rule in other states. If claims are barred elsewhere, but aren't barred here, it could encourage plaintiffs to disproportionately flock to courthouses in Illinois.

"[A]doption of cross-jurisdictional class tolling in Illinois would encourage plaintiffs from across the country to bring suit here following dismissal of their class actions in federal court." *Id.* The Illinois Supreme Court "refuse[d] to expose the Illinois court system to such forum shopping." *Id.*

"Unless all states simultaneously adopt the rule of cross-jurisdictional class action tolling, any state which independently does so will invite into its courts a disproportionate share of suits which the federal courts have refused to certify as class actions after the statute of limitations has run." *Id.*

The rationale behind *Portwood* is an odd fit here. The question at hand is whether an earlier federal lawsuit (*Kyles*) should toll the statute of limitations for a later federal lawsuit (the case at hand). The answer to that question would not affect caseloads in state court. Rowe and Streeter don't pose a docket-clogging, forum-shopping threat to state courts.

*Kyles* and *Rowe* were filed in federal court, in the same district. So, the claims are *same*-jurisdictional, not *cross*-jurisdictional. Applying a cross-jurisdictional rule doesn't make much sense when both cases are in the same courthouse.

For that reason, most courts within this District have concluded that tolling applies when both suits were filed in federal court. *See, e.g.*, *Villanueva v. Davis Bancorp, Inc.*, 2011 WL 2745936, at *5 (N.D. Ill. 2011) (rejecting the argument that tolling did not apply where cases "were both filed in the same federal district," and concluding that *Portwood* only applied "to situations where the same claims have been filed in different forums"); *Wiggins v. Illinois Bell Tel. Co.*, 2015 WL 6408122, at *5 n.5 (N.D. Ill. 2015) ("Because this is not a situation where the two cases crossed state and federal jurisdictions, cross-jurisdictional tolling prohibitions do not apply."); *Walker v. Sheriff of Cook Cnty.*, 2009 WL 803783, at *3 (N.D. Ill. 2009) (holding that the filing of class action in federal court tolled the limitations period for the plaintiff's individual suit until he opted out). *But see Ottaviano v. Home Depot, Inc., USA*, 701 F. Supp. 2d 1005, 1012–13 (N.D. Ill. 2010) (Dow, J.) ("Under *Portwood*, the filing of the . . . state law class actions

in federal court had no effect on the running of the limitations period for Plaintiffs' state law claims.").

Applying equitable tolling to putative class members makes sense, even when they file their own lawsuits before a class certification decision. Maybe Plaintiffs jumped the gun, but jumping the gun isn't a statute-of-limitations problem. If anything, it seems like the opposite.

Under *American Pipe*, equitable tolling applies to all members of the would-be class. The clock stops ticking when the class action complaint hits the docket. The clock doesn't start ticking unless and until the district court denies class certification, or the case is dismissed for other reasons. *See Collins*, 875 F.3d at 844 ("[T]he statute of limitations resumes for putative class members of an uncertified class 'when the suit is dismissed without prejudice or when class certification is denied.'").

When a request for class certification is no longer pending, the clock starts ticking again, and the members of the would-be class can file their own lawsuits. The members of the class have the benefit of tolling from the filing of the class action complaint until the denial of class certification or dismissal. They can sit back, relax, and enjoy the ride – without fear of getting bounced for sleeping on their rights.

Here, Rowe and Streeter arguably jumped the gun. They filed their own lawsuit before the district court in *Kyles* decided class certification or dismissed the case. They could have waited to file their own lawsuits. But instead, they dove right in.

If anything, Rowe and Streeter filed their own lawsuit early, not late. They filed suit before they had a need to do so. They could have waited to see what happens in *Kyles*.

If they had waited for the class certification decision, they could have filed their own lawsuit down the road. If class certification was granted, they could have opted out and filed their own lawsuit. If class certification was denied, they could have filed their own lawsuit.

And all the while, they would have had the benefit of equitable tolling. The clock would not have ticked while they waited.

Rowe and Streeter filed their own lawsuit while the clock was stopped for all members of the would-be class. They arguably filed suit early, *before* they needed to do so, because the clock was stopped anyway.

Denying equitable tolling before a decision on class certification would penalize Plaintiffs for filing their own lawsuit *sooner* than they needed to do so. If they had waited, they would have enjoyed tolling. So it is hard to see why they shouldn't get tolling if they didn't wait.

If anything, it seems upside down to penalize a plaintiff on statute-of-limitations grounds for taking action sooner rather than later. It would be odd if a plaintiff could file too *late*, by filing too *early*.

The Supreme Court in *American Pipe* recognized tolling because a different approach would encourage protective filings. Without tolling, putative class members might file their own lawsuits, just to be on the safe side if class certification is denied.

Here, recognizing equitable tolling would not create bad incentives and encourage early lawsuits. Rowe and Streeter filed their own lawsuits before they needed to do so, because the class action had stopped the clock. The early filing may have been unnecessary – but they aren't getting unfairly rewarded for the early action, either. Again, they could have opted out and filed their own lawsuit someday anyway.

20

Maybe they get to drive the train in their own lawsuit on the early side. But again, that reality seems like a good thing, not a bad thing, from the perspective of the statute of limitations. Showing up too early isn't what the statute of limitations is all about.

This Court agrees with the bulk of the courts within the District. The filing of a prospective class action in federal court tolls the statute of limitations for all members of the putative class. The filing of the class action stopped the clock, and all class members receive the benefit of the stoppage. The clock will not restart until class certification is denied, or the case is dismissed.

A class member who files her own lawsuit early gets the benefit of tolling, too. A class member could wait until the class action falls apart (from the denial of class certification, or dismissal) before filing her own lawsuit. Tolling applies while a class member sits in the waiting area. If that's true, then tolling applies if a class member leaves the waiting area on the early side.

The Court concludes that equitable tolling under *American Pipe* applies to Streeter and Rowe. They were members of the putative class in *Kyles*, so the clock stopped on their claims when that suit was filed on December 3, 2020. *See Kyles v. Hoosier Papa LLC*, 20-cv-7146 (Dckt. No. 1).

The claims by Rowe and Streeter are timely to the extent that they cover the five-year period from December 3, 2015 to December 3, 2020, meaning the five years before the filing of *Kyles*. But the claims are time barred to the extent that they cover anything before December 3, 2015.

21

### III.    *Laches*

Papa John's contends that Plaintiffs' claims are barred by the equitable doctrine of *laches*. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 5–6 (Dckt. No. 23).

"*Laches* is an affirmative defense that is unrelated to the merits of the suit." *PNC Bank, Nat'l Ass'n v. Kusmierz*, 193 N.E.3d 1196, 1206 (Ill. 2022). "Generally, principles of *laches* are applied when a party's failure to timely assert a right has caused prejudice to the adverse party." *Van Milligan v. Bd. of Fire & Police Comm'rs of Vill. of Glenview*, 630 N.E.2d 830, 833 (1994) (citation omitted). "Two elements are necessary for the application of *laches*: (1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party." *Noland v. Mendoza*, 215 N.E.3d 130, 137 (Ill. 2022) (cleaned up).

"The doctrine of *laches* is grounded on the principle that courts are reluctant to come to the aid of a party who knowingly slept on rights to the detriment of the other party." *Monson v. Cnty. of Grundy*, 916 N.E.2d 620, 623 (Ill. App. Ct. 2009). "The general rule is that a delay of six months or longer is *per se* unreasonable." *Id.*

"A plaintiff is not required to plead elements in his or her complaint that overcome affirmative defenses[.]" *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018); *see also United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). "But when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Basically, a motion to dismiss can be granted because of an affirmative defense if a "plaintiff effectively pleads herself out of court by alleging facts that are sufficient to establish the defense." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006).

Papa John's thinks that Rowe and Streeter slept on their rights. As it reads the complaint, Plaintiffs pled that they knowingly scanned their fingers thousands of times, without complaining or looking for alternatives. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 23).

To be sure, the complaint states that Rowe and Streeter used the fingerprint scanner thousands of times. *See* Am. Cplt., at ¶ 41 (Dckt. No. 16) (stating that Rowe used the scanner at least 10,000 times); *id.* at ¶ 42 (stating that Streeter used the scanner at least 15,000 times). But the complaint does not say whether Rowe and Streeter complained about the fingerprint scanner requirement or took action to avoid it. *See generally id.* The complaint does not allege a lack of due diligence, let alone prejudice to Papa John's. So, Plaintiffs haven't pled themselves out of Court by establishing the laches elements.

The doctrine of *laches* is an affirmative defense. Courts don't grant motions to dismiss based on an affirmative defense unless the complaint defeats itself. Here, the complaint alleges that Rowe and Streeter were aware of the fingerprint scanner, but that knowledge is not enough to bounce the claim.

The affirmative defense of *laches* is best reserved for summary judgment, after discovery. The motion to dismiss based on *laches* is denied.

## IV.     Whether Plaintiffs Were Aggrieved

Next, Papa John's argues that Plaintiffs have not pled any aggrievement from the alleged BIPA violations. Instead, the complaint is about "pre-2019 technical violations of BIPA." *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 7–8 (Dckt. No. 23).

To unpack the argument, the Court must take a ride on a state court case: *Rosenbach v. Six Flags Entertainment Corporation*.

In 2017, an Illinois appellate court held that, to recover under BIPA, a plaintiff needed to show that she was "aggrieved" by suffering an adverse effect beyond a technical violation. *See Rosenbach v. Six Flags Ent. Corp.*, 147 N.E.3d 125, 131 (Ill. App. Ct. 2017), *rev'd*, 129 N.E.3d 1197 (Ill. 2019) ("*Rosenbach I*") ("[I]f a person alleges only a technical violation of [BIPA] without alleging any injury or adverse effect, then he or she is not aggrieved and may not recover . . . .").

That interpretation did not last long. The Illinois Supreme Court reversed in 2019. *See Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1207 (Ill. 2019) ("*Rosenbach II*"). The Illinois Supreme Court concluded that a technical violation sufficed as an injury for a BIPA claim. *Id.* "Contrary to the appellate court's view, an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under the Act, in order to qualify as an 'aggrieved' person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act." *Id.* Exposure to risks is enough.

Rowe and Streeter believe that the complaint satisfies *Rosenbach II*. They pled that they have "continuously and repeatedly been exposed to the risks and harmful conditions created by Defendant's repeated violations of the BIPA . . . ." *See* Am. Cplt., at ¶ 63 (Dckt. No. 16).

Rowe and Streeter don't allege that their data *was* stolen, or used for some nefarious purpose. Instead, the complaint alleges that Papa John's increased the risk that Plaintiffs' biometric data *could* be stolen or misused without their consent. *See id.* at ¶¶ 43–46, 50, 53. They simply contend that Papa John's left them vulnerable.

If *Rosenbach I* were the law of the Land of Lincoln, Papa John's might have a point. *See Rosenbach I*, 147 N.E.3d at 131. But it isn't, so Papa John's doesn't.

Papa John's thinks that Rowe and Streeter should have to meet the *Rosenbach I* standard. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 7 (Dckt. No. 23). As the pizza chain views things, "it would be unfair to punish a business for reacting to and complying with then-existing BIPA law." *Id.*

Not so. The statute didn't change. The interpretation of the statute did. And this Court is duty-bound to apply the controlling interpretation of that statute laid down by the Illinois Supreme Court in *Rosenbach II*.

If anything, *Rosenbach II* confirms that it governs conduct that took place before *Rosenbach II* came down. That case involved a fingerprint scanner at a Six Flags amusement park in 2014. *See Rosenbach II*, 129 N.E.3d at 1201. After clarifying the meaning of the word "aggrieved," the Illinois Supreme Court remanded to the trial court for further proceedings *consistent with its opinion*. *Id.* at 1200.

So, in *Rosenbach* itself, the defendant's pre-*Rosenbach II* conduct was judged by a post-*Rosenbach II* standard. Judges in plenty of other cases have applied *Rosenbach II* to assess pre-*Rosenbach II* conduct, too. *See, e.g.*, *Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 617 (N.D. Ill. 2019) (applying *Rosenbach II* in case alleging pre-*Rosenbach II* injuries); *Quarles v. Pret A Manger (USA) Ltd.*, 2021 WL 1614518, at *4 (N.D. Ill. 2021) (same); *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 963 (N.D. Ill. 2020) (same).

When applying Illinois law, federal courts must follow the holdings of the Illinois Supreme Court, but need not always follow lower appellate courts. "[Federal courts] must defer to a state court's interpretation of the state's statute. . . . In the absence of a decision by the highest state court, . . . [d]ecisions of intermediate appellate state courts generally control unless

there are persuasive indications that the highest state court would decide the issue differently." *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 934 (7th Cir. 2018) (citations omitted).

That's a long way of saying that *Rosenbach II* applies to the case at hand. It is a definitive ruling by the highest court in the state. Therefore, Rowe and Streeter didn't need to plead that they were "aggrieved" within the meaning of *Rosenbach I*. So the motion to dismiss on that grounds is denied.

## V.     State of Mind for Statutory Damages

Next, Papa John's contends that "Plaintiffs' conclusory allegations that Papa John's negligently or recklessly failed to comply with BIPA are insufficient to plead a claim, and should be dismissed." *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 8 (Dckt. No. 23).

Not so. The complaint does enough to allege negligence or intent.

BIPA allows "a prevailing party to recover the greater of actual damages or $1,000 in liquidated damages for each negligent BIPA violation, and the greater of actual damages or $5,000 in liquidated damages for each intentional or reckless BIPA violation." *Sosa v. Onfido, Inc.*, 600 F. Supp. 3d 859, 873 (N.D. Ill. 2022) (citing 740 ILCS 14/20(1)-(2)). BIPA also allows prevailing parties to recover reasonable attorneys' fees, costs and other litigation expenses (regardless of the defendant's mindset). *See* 740 ILCS 14/20(3).

Rowe and Streeter seek statutory damages plus attorneys' fees and costs. *See* Am. Cplt. (Dckt. No. 16). Specifically, they seek damages of $5,000 for each willful or reckless BIPA violation, or, in the alternative, damages of $1,000 for each negligent BIPA violation. *Id.* Rowe and Streeter also seek reasonable attorneys' fees and costs under 740 ILCS 14/20(3). *Id.*

At the pleading stage, a plaintiff is not required to show that she is entitled to a specific form of relief. She simply needs to plead facts showing a plausible claim. *See Davis v.*

*Passman*, 442 U.S. 228, 239 (1979) ("[A] 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive.") (cleaned up); *see also Jones v. Butler*, 663 F. App'x 468, 470 (7th Cir. 2016).

So, "if the complaint plausibly pleads violations of [of BIPA] . . . then, even absent specific allegations about [the defendant's] mental state with respect to each of those claims, it has stated a claim entitling [the plaintiff] to litigation expenses and injunctive relief under Section 20, whether or not she proves an entitlement to damages based on negligent, reckless, or intentional conduct." *Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 615 (N.D. Ill. 2020); *see also Sosa*, 600 F. Supp. 3d at 874–75 (opining that a plaintiff is not required to plead facts showing her entitlement to a specific form of relief under the BIPA); *Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522, 531 (N.D. Ill. 2022) (stating that "even if Plaintiff failed to adequately allege a basis for monetary damages for negligent, intentional, or reckless conduct, that does not warrant dismissal of her BIPA claims" because she could still obtain injunctive relief or attorneys' fees); *Kyles v. Hoosier Papa LLC*, 2023 WL 2711608, at *7 (N.D. Ill. 2023) ("[T]he rules do not require Plaintiff to allege state-of-mind for his BIPA claims to proceed.").

"States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). BIPA claims survive motions to dismiss when plaintiffs plead facts suggesting that defendants knew about BIPA's requirements but did not take steps to comply. *See, e.g.*, *Rogers v. BNSF Ry. Co.*, 2019 WL 5635180, at *5 (N.D. Ill. 2019) ("As Rogers points out, the BIPA took effect more than ten years ago, and if the allegations of his complaint are true – as the Court must assume at this stage – BNSF has made no effort to comply with its requirements. This is certainly enough, at the pleading stage, to make a claim of negligence or recklessness

plausible."); *Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 786 (N.D. Ill. 2020) ("The complaint alleges that Kronos, as late as 2018 or 2019, continued to systematically collect and disseminate biometric data without complying with BIPA, which had been enacted a decade earlier in 2008. From that allegation, a plausible inference may be drawn that Kronos acted negligently."); *Horn v. Method Prod., PBC*, 2022 WL 1090887, at *2 (N.D. Ill. 2022) (opining that "by alleging that Method has made no effort to comply with BIPA, Horn has pleaded facts to suggest that Method acted with negligence, recklessness, or intent").

Plaintiffs point to several paragraphs in the amended complaint that they believe show that Papa John's acted intentionally. *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 10 (Dckt. No. 28).

For example, they pled that Defendants collected, stored, and used their fingerprints without their consent, in violation of BIPA. *See* Am. Cplt., at ¶¶ 27–31, 33, 35–39, 40 (Dckt. No. 28). They also alleged that Papa John's developed and operated FOCUS, required its franchisees to use FOCUS, and accessed the system remotely to collect data and monitor fingerprint usage. *Id.* at ¶¶ 17–22, 26.

Rowe began working at Ozark in 2014, six years after BIPA was enacted in 2008. *Id.* at ¶ 15. Streeter joined Ozark in 2017, nearly a decade after BIPA's enactment. *Id.* at ¶ 51. Papa John's had years of notice about BIPA, but Plaintiffs allege that it didn't comply. *Id.* at ¶ 64 ("Defendant knew, or was reckless in not knowing, that the biometric timekeeping systems that it used would be subject to the provisions of BIPA, a law in effect since 2008, yet wholly failed to comply with the statute.").

Therefore, the pleadings support a plausible inference that Papa John's knew about BIPA's requirements, and ignored them. *See Kyles*, 2023 WL 2711608, at *8 (concluding that

the plaintiff plausibly suggested that Papa John's acted recklessly by failing to comply with BIPA's requirements by pleading that the statute had been in effect for years, Papa John's did frequent business in Illinois, and BIPA had received significant news attention).

And again, the complaint does not need to allege intent to survive. A BIPA claim can rest on an allegation of negligence. Here, the complaint does more than enough to allege that Papa John's negligently failed to comply with BIPA (or worse).

The motion to dismiss based on a lack of allegations about the mental state of Papa John's is denied.

## VI.    Excess Fines Under the Due Process Clause

In a single paragraph, Papa John's argues that Plaintiffs' claims violate the Fourteenth Amendment Due Process Clause and the Illinois Constitution's Due Process Clause because Plaintiffs seek to recover millions of dollars based on "alleged technical violations of a statute." *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 10–11 (Dckt. No. 23).

The "Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). To determine when a punishment is "grossly excessive" under *Gore*, "the district court should consider: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Sommerfield v. Knasiak*, 967 F.3d 617, 623 (7th Cir. 2020).

The Illinois Supreme Court has recognized the *Gore* guideposts. *See Doe v. Parrillo*, 185 N.E.3d 1248, 1263 (Ill. 2021). And the Illinois Supreme Court has "repeatedly recognized the

29

potential for significant damages awards under [BIPA]." *Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 928 (Ill. 2023).

At one time, the Illinois Supreme Court explained that big damages awards are possible because a "separate claim accrues under the Act each time a private entity scans or transmits an individual's biometric identifier or information in violation of section 15(b) or 15(d)." *Id.* at 920.

However, the Illinois Supreme Court has concluded that "policy-based concerns about potentially excessive damage awards under the Act are best addressed by the legislature." *Id.* at 929. So, the courts have not sliced BIPA's statutory damages provision. *Id.*

A few months ago, the General Assembly amended the statute to place a cap on the amount of statutory damages that a plaintiff can recover. The Governor signed the bill into law a few weeks ago.

The new law is hot off the press. Commentators are debating whether the statute applies retroactively. Courts have not yet reached that issue. And the parties haven't teed it up, either.

So, in the meantime, this Court will keep its powder dry. This Court denies the motion to dismiss based on the Fourteenth Amendment and the Illinois Constitution without prejudice. The parties have not addressed whether the new amendment applies retroactively, and there is no need to reach a constitutional issue at this early stage.

If need be, this Court can decide this question down the road. An "award that would be unconstitutionally excessive may be reduced . . . ." *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). So, courts often reduce damages that are unconstitutionally excessive, rather than dismissing a case outright. *See, e.g.*, *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 778 (N.D. Ill. 2008) (concluding that it was "premature at [the motion to dismiss] stage to consider whether any hypothetical award might be

constitutionally excessive"); *see also Rodrigue v. Lowe's Home Ctrs., LLC*, 2021 WL 3848268, at *6 (E.D.N.Y. 2021) ("Even if defendants were correct that liquidated damages equal to 'the amount of all late payments' would violate the Due Process Clause, defendants have offered no reason why they would be entitled to dismissal of plaintiff's claim – rather than a reduction in damages.").

For now, the motion to dismiss based on the constitutional challenge to excessive damages is denied.

## VII. Dismissal as Duplicative of *Kyles* Class Action

Finally, Papa John's seeks dismissal because this case is duplicative of the pending class-action suit in *Kyles*. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 11 (Dckt. No. 23).

The overlap between this case and the *Kyles* case is undeniable. Both cases involve claims that Papa John's violated BIPA through the fingerprint scanner in the FOCUS system. In fact, Rowe and Streeter concede that they fall within the putative class in *Kyles*. *See* Am. Cplt., at 3 n.2 (Dckt. No. 16); *see Kyles* Cplt., at ¶ 39 (Dckt. No. 23) (defining the putative class as "[a]ll individuals who used a fingerprint scanner connected to a FOCUS system in the state of Illinois at any point from December 3, 2016 to the present").

Even so, Rowe and Streeter believe that their claims should stay because they are exercising their right to go it alone. They have elected to bring individual claims "rather than remain members of a putative class action that makes similar allegations against the same Defendant." *See* Pls.' Resp. to Def.'s Mtn. to Dismiss, at 13 (Dckt. No. 28).

District courts have wide latitude to determine whether cases are duplicative. *See Norfleet v. Stroger*, 297 F. App'x 538, 540 (7th Cir. 2008). "[S]uits are not duplicative if the parties, claims, facts, and requested relief are substantially different." *Id.* And dismissal is

disfavored. *See Williams v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 4106067, at *12 (N.D. Ill. 2023) (collecting cases).

As things stand, Rowe and Streeter are not *really* parties in *Kyles*. They are putative members of a class that may (or may not) be certified under Rule 23(b)(3). *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (rejecting "the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before the class is certified.*") (emphasis in original).

And more importantly, a class member has no obligation to remain in the class. Quite the opposite – a class member has the right to go it alone. A class member doesn't have to stay a class member. A class member can elect to pull the rip cord, and advance his or her own interests by flying solo.

Even if the *Kyles* class were certified, Rowe and Streeter "may opt out and litigate independently." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006); *see also* Fed. R. Civ. P. 23(c). In effect, Rowe and Streeter bailed out of the *Kyles* case ahead of schedule.

It is true that the two cases share common ground. But that's not much of a reason to dismiss this case. In effect, dismissal would compel Rowe and Streeter to stay in the class (for the time being, anyway), but they have no duty to stay in the class. And in any event, there isn't much downside to letting them go it alone. They can't recover for the same injury twice, in two separate lawsuits.

Basically, Plaintiffs have the right to grab the litigation wheel. Rowe and Streeter can decide to drive a separate vehicle, rather than sitting on the *Kyles* bus. And they've elected to go their own way.

Therefore, the Court will not dismiss this suit as duplicative of *Kyles*.

## Conclusion

For the foregoing reasons, the motion to dismiss the amended complaint is granted in part and denied in part. The claims are dismissed as time barred to the extent that they cover the period before December 3, 2015 (*i.e.*, more than five years before the filing of the *Kyles* case on December 3, 2020). The motion to dismiss is otherwise denied.

Date:   August 23, 2024

Steven C. Seeger
United States District Judge